<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

```
_____ :
                               :
WILLIAM BELTRAN,               :
                               :     Civil Action No. 12-2042(DRD)
          Petitioner,          :
                               :
     v.                        :     OPINION
                               :
BEVERLY HASTINGS, et al.,      :
                               :
          Respondents.         :
                               :
_____ :
```

**APPEARANCES:**

William Beltran
East Jersey State Prison
Lock Bag R
Rahway, NJ  07065
     Petitioner <u>pro</u> <u>se</u>

Christopher W. Hsieh
Office of the Passaic County Prosecutor
401 Grand Street
Paterson, NJ  07505
     Counsel for Respondents

**DEBEVOISE**, District Judge

     Petitioner William Beltran, a prisoner currently confined
at East Jersey State Prison in Rahway, New Jersey, has submitted
a petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254.  The respondents are Administrator Beverly Hastings and
the Attorney General of New Jersey.

For the reasons stated herein, the Petition shall be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth at length in the opinion of the Supreme Court of New Jersey.[1]

> On January 1, 2005, at approximately 4:00 a.m., J.C. spoke with D.L., his then-sixteen-year-old former girlfriend. She told him that she and family members had been out celebrating the new year and then went home to bed. At some point thereafter, her cousin came to her bedroom and raped her. While telling J.C. this, she also told him that defendant, who is her stepfather, had also previously sexually abused her when she was fourteen years old. According to J.C., D.L. was "hysterical" and "crying a lot." J.C. discussed what he was told with his older sister who subsequently called the Division of Youth and Family Services (DYFS).

> On January 12, 2005, the Passaic County Prosecutor's Office (PCPO) received a referral from DYFS, which indicated that D.L. was being sexually abused by her stepfather. Detective Donna Gade, the supervisor of the PCPO's Special Victim's Unit, immediately commenced an investigation.

> At approximately 9:00 p.m., two DYFS investigators arrived at defendant's home and asked to speak with D.L. G.R., D.L.'s mother and defendant's

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

wife, called D.L. downstairs, and the investigators spoke with D.L. privately in the kitchen for approximately fifteen minutes. The investigators did not give G.R. a reason for the visit, but G.R. assumed it had to do with the incident involving her nephew. The investigators said they would return later that evening, but did not. Instead, at approximately 10:00 p.m. that evening, Det. Gade, Detective Matthew Gallup, and two other detectives went to defendant's home to "try to locate [D.L.] and her mother as well as the suspect if he were home."

G.R. told Det. Gade that defendant was not home. G.R. contacted defendant and he returned home about fifteen minutes later. Det. Gade testified that she met defendant outside of the house and said that she was interested in speaking with him regarding a "family problem[.]" Det. Gade asked defendant if he would accompany the detectives to the prosecutor's office and defendant agreed. G.R. also agreed to go to the prosecutor's office, and D.L. was asked to accompany her. Det. Gade transported G.R. and D.L.; defendant rode with other detectives in another car. They arrived at the prosecutor's office around 11:00 p.m.

At the PCPO, defendant was placed in the polygraph room. D.L. and G.R. were placed in separate rooms because Det. Gade "didn't want anybody talking to each other." Det. Gade interviewed D.L., who said that, on two separate occasions, defendant had penetrated her vagina with his fingers and his penis. D.L. said that, after these incidents, defendant stopped touching her in a sexual manner. According to Det. Gade, D.L. appeared visibly upset and uncomfortable discussing the matter.

Sometime between 12:27 a.m. and 1:40 a.m., D.L.'s statement was typed. D.L. reviewed it and placed her initials on the top and bottom of each page. D.L. then signed and swore to the truthfulness of her statement before Det. Gallup. After D.L. signed her written

statement, Det. Gade took defendant to an interview room for questioning. Defendant was not handcuffed and Det. Gade was not armed.

Det. Gade provided Miranda [FN1] warnings to defendant, using the PCPO's Miranda rights and waiver form. She read each right to defendant and asked him if he understood what she said. Defendant replied that he understood and placed his initials after each right listed on the form, indicating his understanding of his rights. He also signed the "waiver of rights" portion of the form. Det. Gade and Det. Gallup each signed the form as witnesses at approximately 2:10 a.m.

> [FN1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Det. Gade then interviewed defendant. Defendant answered Det. Gade's preliminary questions; Det. Gade explained that defendant appeared to be "pretty comfortable" and "acted like a gentleman throughout the whole interview." Det. Gade informed defendant that she had learned that he had engaged in inappropriate conduct with D.L. According to Det. Gade, defendant was "very shocked" and denied that anything inappropriate had occurred. Defendant said that he would never do anything to hurt D.L. and she was like his "own child." However, after sitting for a while and thinking, defendant told Det. Gade that "yeah, you know, I do remember a time when I did have sex with her." Elaborating further, defendant stated that he had been drunk, came home, went to D.L.'s room, crawled into D.L.'s bed and had sex with her.

Defendant agreed to provide Det. Gade with a written statement. At approximately 3:42 a.m., Det. Gade left the room and returned with an individual who typed defendant's responses to her questions. Det. Gade also videotaped defendant's statement. In his videotaped and transcribed statement, defendant acknowledged that he had sexual relations with D.L. twice.

Defendant stated that, on both occasions, he placed his fingers and penis in D.L.'s vagina. Det. Gade asked defendant how she had treated him that evening, and he said Det. Gade had treated him "with kindness and care." After defendant's statement was completed, it was printed and given to defendant for review and signing. Defendant placed his initials on the top and bottom of each page, and signed it at the end. As they had in respect of D.L.'s written statement, Det. Gade and Det. Gallup each signed the statement as witnesses. Defendant was formally arrested and charged at about 5:00 a.m.

At trial, D.L. recanted her earlier statement; she testified that the statement she gave to the investigators was false. She said that she was in love with J.C. at the time, and defendant and G.R. did not approve of the relationship. D.L. stated that if she could not be with J.C., she would claim that defendant sexually abused her so that defendant and her mother too could not "be together."

Defendant also testified at the trial. He said that, on January 12, 2005, he left work at around 5:00 or 5:30 p.m. and went to a "social club." Defendant drank two beers and two "shots" of gin. Defendant left the club about thirty to forty-five minutes later, went to his home to get maracas, and returned to the club to play with a band. Defendant said that he drank four more drinks and a "couple of shots" after returning to the club.

According to defendant's trial testimony, he left the club around 10:00 or 10:15 p.m. As he was leaving, he received a phone call from G.R., who said that someone was at their house looking for him. Defendant returned home at approximately 10:15 or 10:30 p.m. A police car was in the driveway. He stated that one of the police officers grabbed him and told him to put his hands against the wall. The officers patted him down and put him into the police vehicle. Defendant

asserted that he did not have an opportunity to refuse to get into the car.

Defendant further testified that he was taken to the prosecutor's office, placed in a locked room and told to wait there. Although the door to the room was locked, he was allowed to leave the room with supervision to go to the bathroom. Defendant claimed that he was kept in the room for about two or two-and-a-half hours and then taken to another room. He asserted he still had no idea why he was at the prosecutor's office, and had nothing to eat or drink after he arrived.

He also testified that he was "tired" and "tipsy" but tried to "keep [his] cool[.]" According to defendant, he was taken to another room, and that Det. Gade entered the room and told him to sign a piece of paper. Defendant believed the paper was the <u>Miranda</u> form. Defendant testified that he did not remember if he understood his rights because he had never seen a form like that before.

Defendant additionally testified that Det. Gade told him that D.L. had provided a statement indicating that defendant had sex with her. Defendant denied the allegations, but Det. Gade kept repeating the details "over and over again[.]" He said that Det. Gade told him that he had to tell her what she wanted to hear "because that's the only way we can all go home." Defendant testified that he was "tired" and "just wanted to go home." He stated that he eventually told Det. Gade "what she wanted to hear[.]"

<u>State v. W.B.</u>, 205 N.J. 588, 597-601 (2011).

B.   <u>Procedural History</u>

Following a jury trial in the Superior Court of New Jersey, Passaic County, Petitioner was convicted of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a(2)(c) (count one),

second-degree sexual assault, N.J.S.A. 2C:14-2c(4) (count two),
second-degree endangering the welfare of a child, N.J.S.A.
2C:24-4a (count three), and fourth-degree aggravated criminal
sexual contact, N.J.S.A. 2C:14-2a(2)(c) and 14-3a (count four).
After appropriate mergers, the trial court sentenced Petitioner
to a ten-year term of imprisonment on the aggravated sexual
assault count, subject to the provisions of the No Early Release
Act, N.J.S.A. 2C:43-7.2, and to a consecutive five-year term of
imprisonment on the endangering count.

On direct appeal, the Superior Court of New Jersey,
Appellate Division, affirmed the conviction but remanded for
resentencing on count three and for a recalculation of
applicable jail credits. State v. W.B., 2009 WL 5062352 (N.J.
Super. App. Div. Dec. 28, 2009).[1] The Supreme Court of New
Jersey granted certification, State v. W.B., 201 N.J. 442
(2010), and affirmed the conviction, State v. W.B., 205 N.J. 588
(2011).

This Petition timely followed.  Here, Petitioner asserts
the following grounds for relief:

> GROUND ONE:  PETITIONER'S RIGHTS UNDER THE FOURTH,
> FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED
> STATES CONSTITUTION WERE VIOLATED WHEN HE WAS SEIZED
> AND A STATEMENT OF CONFESSION WAS TAKEN FROM HIM
> INVOLUNTARILY. ...

---

[1] The parties have not provided the Court with the amended
judgment or transcript of the re-sentencing.

GROUND TWO:  THE JURY CHARGE REGARDING CHILD SEXUAL
ABUSE ACCOMMODATION SYNDROME VIOLATED THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, PARTICULARLY DEFENDANT'S RIGHT TO A JURY
TRIAL, BECAUSE THAT CHARGE DEPRIVED PETITIONER OF HIS
RIGHT TO HAVE THE JURY ENGAGE IN AN UNFETTERED
DETERMINATION OF THE CREDIBILITY OF THE WITNESS AS
PART OF ITS DETERMINATION OF THE QUESTION OF
PETITIONER'S GUILT. ...

GROUND THREE:  PETITIONER'S RIGHTS UNDER THE SIXTH AND
FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
WERE VIOLATED WHEN THE PROSECUTION WAS ALLOWED TO
ELICIT TESTIMONY FROM AN EXPERT ON CHILD SEXUAL ABUSE
ACCOMMODATION SYNDROME THAT WENT BEYOND PERMISSIBLE
LIMITS.  THE TRIAL COURT THEREAFTER GAVE AN ERRONEOUS
CHARGE TO THE JURY WITH REGARDS TO THE EXPERT'S
TESTIMONY. ...

GROUND FOUR:  PETITIONER WAS DENIED HIS RIGHTS UNDER
THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION WHEN THE PROSECUTION GAVE A
SUMMATION THAT EXCEEDED FAIR ADVOCACY. ...

GROUND FIVE:  PETITIONER'S RIGHTS UNDER THE FIFTH,
SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT
ALLOWED THE JURY TO VIEW A VIDEOTAPE STATEMENT OF
PETITIONER DURING ITS DELIBERATIONS THAT WAS NEVER
ENTERED INTO EVIDENCE DURING THE PLENARY TRIAL. ...

(Petition, ¶ 12.)[2]  Petitioner has also filed a Motion [16] for

_____

[2] On direct appeal, Petitioner presented Grounds Two, Three, and
Five as violations of his right to a fair trial, without
specific reference to the Constitutional provisions proffered
here as grounds for relief.  (Answer, Ex. 23, Petitioner's Brief
on Appeal to the Appellate Division and Ex. 32, Petitioner's
Brief on Petition for Certification.)  The Supreme Court has
long emphasized that federal habeas courts "cannot treat a mere
error of state law, if one occurred, as a denial of due
process." Gryger v. Burke, 334 U.S. 728, 731 (1948), quoted in
Kunco v. Attorney General of the Commonwealth of Pennsylvania,
85 F.App'x 819, 820 (3d Cir. 2003).  Nevertheless, it appears
that the Supreme Court of New Jersey treated Petitioner's claims

an evidentiary hearing with respect to the claims regarding the expert's testimony and associated jury instructions, and the prosecutor's summation.  These matters have been fully briefed by the parties, and this matter is now ready for decision.

## II.  <u>28 U.S.C. § 2254</u>

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the

---

as due process claims and, out of an abundance of caution, this Court will also review them as due process claims.

governing law set forth in [Supreme Court] cases," or "if the
state court confronts a set of facts that are materially
indistinguishable from a decision of th[e] Court and
nevertheless arrives at a result different from [the Court's]
precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000)
(O'Connor, J., for the Court, Part II), cited in Ely v. Erickson,
712 F.3d 837 (3d Cir. 2013).

A state court decision "involve[s] an unreasonable
application" of federal law "if the state court identifies the
correct governing legal rule from [the Supreme] Court's cases but
unreasonably applies it to the facts of the particular state
prisoner's case," and may involve an "unreasonable application" of
federal law "if the state court either unreasonably extends a
legal principle from [the Supreme Court's] precedent to a new
context where it should not apply or unreasonably refuses to
extend that principle to a new context where it should apply,"
(although the Supreme Court expressly declined to decide the
latter). Id. at 407-09. See also Moore v. DiGuglielmo, No. 09-
2189, 489 F.App'x 618, 624 n.2 (3d Cir. 2012) (noting the same).
To be an "unreasonable application" of clearly established
federal law, the state court's application must be objectively
unreasonable. Williams, 529 U.S. at 409. "This standard … is
'difficult to meet': To obtain habeas corpus relief from a
federal court, a state prisoner must show that the challenged

state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  Metrish v. Lancaster, 133 S.Ct. 1781, 1786-87 (2013) (quoting Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011)).  The scope of the record for a § 2254(d)(1) enquiry is limited to the record before the state court that adjudicated the claim on the merits.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).

The "clearly established Federal law" referred to in § 2254(d)(1) consists of the U.S. Supreme Court precedents at the time of the state court decision adjudicating the petitioner's claims.  Greene v. Fisher, 132 S.Ct. 38 (2011).  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, however, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999), cited in Glenn v. Wynder, No. 12-4333, 2014 WL 642947, *5 n.6 (Feb. 20, 2014) and Hardcastle v. Horn, 368 F.3d 246, 256 n.3 (3d Cir. 2004).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)), cited in Wright v. Vaughn, 473 F.3d 85, 91 (3d Cir. 2006).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 397-98 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002) and Woodford v. Visciotti, 537 U.S. 19 (2002)).

With regard to § 2254(d)(2), the Court of Appeals for the Third Circuit has held that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless [the state court's findings of fact are] objectively unreasonable in light of the evidence presented in the state-court proceeding." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quotation marks omitted), quoted in Blystone v. Horn, 664 F.3d 397, 418 (2011).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d

Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).

### III.   ANALYSIS

A.   <u>The Request for an Evidentiary Hearing</u>

Petitioner requests an evidentiary hearing in support of his claims regarding the admission of expert testimony, the jury instructions regarding the use of the expert testimony, and the alleged improper closing remarks of the prosecutor.

Prior to enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996), the Supreme Court held that "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." <u>Townsend v. Sain</u>, 372 U.S. 293, 312 (1963). Indeed, in certain circumstances, an evidentiary hearing was mandatory.

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.
>
> ...
>
> [A] federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2)

the state factual determination is not fairly
supported by the record as a whole; (3) the fact-
finding procedure employed by the state court was not
adequate to afford a full and fair hearing; (4) there
is a substantial allegation of newly discovered
evidence; (5) the material facts were not adequately
developed at the state-court hearing; or (6) for any
reason it appears that the state trier of fact did not
afford the habeas applicant a full and fair fact
hearing.

Id. at 312-13.  The Supreme Court later refined this standard
with respect to the fifth circumstance enumerated in Townsend,
requiring a prisoner to "show cause for his failure to develop
the facts in the state-court proceedings and actual prejudice
resulting from that failure," but not otherwise curtailing the
Townsend list.  Keeney v. Tamayo-Reyes, 504 U.S. 1, 11 (1992).
Keeney's threshold standard of diligence was codified by AEDPA
in the opening clause of new 28 U.S.C. § 2254(e)(2).  Williams
v. Taylor, 529 U.S. 420 (2000).

Title 28 Section 2254(e) now curtails the circumstances
under which a District Court may grant an evidentiary hearing.
It provides:

(e)(1)  In a proceeding instituted by an
application for a writ of habeas corpus by a person in
custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court
shall be presumed to be correct.  The applicant shall
have the burden of rebutting the presumption of
correctness by clear and convincing evidence.

(2)  If the applicant has failed to develop
the factual basis of a claim in State court
proceedings, the court shall not hold an evidentiary
hearing on the claim unless the applicant shows that—

       (A)  the claim relies on–
         (i)  a new rule of constitutional law,
made retroactive to cases on collateral review by the
Supreme Court that was previously unavailable; or
         (ii)  a factual predicate that could not
have been previously discovered through the exercise
of due diligence; and

       (B)  the facts underlying the claim would
be sufficient to establish by clear and convincing
evidence that but for constitutional error, no
reasonable factfinder would have found the applicant
guilty of the underlying offense.

28 U.S.C. § 2254(e).

Thus, if a prisoner fails to develop the factual basis of a claim in State court proceedings, through some lack of diligence or greater fault attributable to the prisoner or the prisoner's counsel, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2). Williams, 529 U.S. at 429-37.  Conversely, where the facts have not been developed in State court proceedings through no fault of the prisoner or the prisoner's counsel, the prisoner is "excused from showing compliance with the balance of the subsection's requirements."  Id. at 437.

       However, even if a new evidentiary hearing is
permitted under AEDPA--when it is solely the state's
fault that the habeas factual record is incomplete--
AEDPA, unlike Townsend and Keeney, does not require
that such a hearing beheld.  Instead, federal courts
have discretion to grant a hearing or not.  In
exercising that discretion, courts focus on whether a
new evidentiary hearing would be meaningful, in that a
new hearing would have the potential to advance the
petitioner's claim.

Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000).

More specifically, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Schriro v. Landrigan, 550 U.S. 465, 474 (2007), quoted in Cullen v. Pinholster, 131 S.Ct. 1388, 1399 (2011).

Here, as discussed more fully, below, all of Petitioner's claims were addressed on the merits by the Supreme Court of New Jersey.  Thus, this Court is limited, on federal habeas review, to a review of the state court's decision in light of the record before that court.  See 28 U.S.C. § 2254(d)(1), (2); Cullen v. Pinholster, 131 S.Ct. at 1398; Schriro v. Landrigan, 550 U.S. at 474-75.  Moreover, Petitioner has failed to describe any relevant facts that could be ascertained through an evidentiary hearing, who the witnesses might be, what the evidence might be, or how any evidentiary hearing could contribute to the resolution of his claims.  Finally, all of the claims asserted here can readily be resolved through review of the state court record.  The request for an evidentiary hearing will be denied.

B.   The Miranda Claim

Petitioner asserts that his Fourth, Fifth, and Sixth Amendment rights were violated when he was seized at his home

and a statement of confession taken from him.[3]  The Supreme Court

of New Jersey rejected these claims on direct appeal.

> We first examine the admissibility of defendant's
> statement. He asserts it should have been "suppressed"
> because he was detained without probable cause and
> questioned "in the early morning hours until his will
> was overborne." [FN3] Essentially defendant claims
> that his confession was not voluntarily given.
>
> > [FN3] ... [T]he State has the affirmative
> > duty to prove--in New Jersey by proof beyond
> > a reasonable doubt--both that the
> > defendant's statement was voluntarily and,
> > if custodial, that the defendant was advised
> > of his rights and knowingly, voluntarily and
> > intelligently waived them.
>
> As already noted, defendant was taken to PCPO
> headquarters at approximately 11:00 p.m., but was not
> given his Miranda warnings until 2:10 a.m. His formal
> statement did not start until 3:42 a.m., ended after
> 4:00 a.m., and he was arrested at approximately 5:00
> a.m. In his videotaped statement defendant
> acknowledged that he drank two bottles of beer and a
> shot of gin the day the police came to his house, but
> voluntarily went to headquarters with Det. Gade. After
> making the statement, and acknowledging that it was
> truthful, defendant signed the statement in front of
> Det. Gallup and Det. Gade as witnesses.

---

[3] The Sixth Amendment provides that "[i]n all criminal
prosecutions, the accused shall enjoy the right ... to have the
Assistance of Counsel for his defence." The Sixth Amendment
right to counsel, however, "does not attach until a prosecution
is commenced, that is, at or after the initiation of adversary
judicial criminal proceedings – whether by way of formal charge,
preliminary hearing, indictment, information, or arraignment."
McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (citations and
internal quotation marks omitted), cited in U.S. v. Santiago,
180 F.App'x 337, 339 (3d Cir. 2006).  Petitioner was not under
indictment at the time he made his statement to police, so there
was no violation of his Sixth Amendment right to counsel at that
time.  Accordingly, Petitioner is not entitled to relief on this
claim.

Defendant claims that he was intoxicated, denied food, water and sleep, and forced to remain in a "four by four box" for hours before being taken to another room and interrogated for more than an hour and one-half. Defendant also asserts that he gave an untrue statement and stated what Det. Gade wanted to hear because he was tired and "just wanted to go home."

Before us, defendant first asserts there was no probable cause to "arrest" and take him to PCPO headquarters. We disagree. First, while he points to defense testimony at the hearing on the motion to suppress that officers entered defendant's home without a warrant looking for him, there was no such finding by the trial judge. In any event, defendant was not there and nothing was seized. Had the police sought to arrest defendant in his home, probable cause to obtain a warrant would have been required. State v. Brown, 205 N.J. 133, 14 A.3d 26 (2011) ("Absent exigent circumstances or consent, the police must obtain a warrant to conduct an arrest inside a home.") (citations omitted) (Op. at 145, 14 A.3d 26).

The motion judge found that defendant returned home to meet Det. Gade and voluntarily agreed to accompany her to PCPO headquarters with other family members to discuss a family matter. The voluntary act of going to headquarters thus negates the need for probable cause in this case. Furthermore, while at PCPO headquarters, it was entirely appropriate for Det. Gade to keep defendant separated from his family while obtaining information from the victim, her mother, and a DYFS investigator. Such separation does not necessitate probable cause, but was instead an attempt to safeguard D.L. ...

We also reject defendant's contention that his recorded statement was not admissible. At the N.J.R.E. 104 hearing to determine the admissibility of the statement, Det. Gade testified that she had been employed with PCPO for approximately twelve years, with seven years in the Megan's Law Special Victims Unit. She further testified that she "read each right aloud ... verbatim," and did not force or coerce defendant to sign the Miranda waiver form. She admitted that she did not tape the pre-statement

interview, and left defendant in the interview room by himself for a few hours.

With respect to the statement itself, the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, guarantees the right against self-incrimination, and has been codified in the New Jersey Rules of Evidence, N.J.R.E. 503, pursuant to N.J.S.A. 2A:84A-19. Inherent in every Fifth Amendment analysis is the question of whether the statement was voluntary, and, independently, whether the law enforcement officers taking it complied with Miranda. ... See also Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); State v. Knight, 183 N.J. 449, 461-63, 874 A.2d 546 (2005) (detailing factors to be considered under "the totality of the circumstances" in determining voluntariness).

In his written opinion admitting defendant's statement, the trial judge determined:

When [defendant] was escorted at around 11:00 p.m. to the PCPO headquarters, he was not under arrest, not restrained and in no manner under duress. He enjoyed pleasant conversation with the officers in the vehicle and was placed in an office upon arrival at headquarters. The office ... is a standard six feet by six feet, windowless room containing a table and chairs. There were no trappings of restraint or police-work such as handcuffs, bars or other weapons. While [defendant] was waiting in the room, he was able to use the restroom, if he so chose, he was able to walk freely within the room and he even read an entire People Magazine. Granted, the [d]efendant had to wait over three hours to be interviewed and he did not eat or drink at all during that time, that length of time does not pose a problem for the [c]ourt. The officers were conducting multiple interviews with the victim, the victim's mother and others to determine what role, if any, the [d]efendant had in the DYFS referral.

The [d]efendant was not questioned in any way until he was moved to an interrogation room with a video camera to record the proceedings. At that point, he was read his Miranda rights by ... Gade, which [defendant] subsequently waived, and the interrogation leading to his confession began. This [c]ourt reviewed the videotaped confession and found no improprieties by the officers. There was no coercion, force or threats, made toward the [d]efendant for him to confess.[FN8]

> [FN8] Consideration of "the totality of the circumstances surrounding the arrest and interrogation, [should include] such factors as the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved[,] as well as a suspect's previous encounters with the law."

This court is satisfied that the confession was the product of a knowing, voluntary and intelligent waiver of [d]efendant's Miranda rights. As well, the videotape confession shows the entire conversation the officers had with [defendant], and at no time was [he] under duress, threatened with force, forced to confess or coerced to do so. Therefore, this Court denies the [d]efendant's request to suppress the confession.

The Appellate Division likewise rejected defendant's claims that his confession was involuntary, and found sufficient evidence in the record to sustain the trial court's fact finding. The panel determined that the trial judge carefully considered the totality of the circumstances in upholding the admissibility of the recorded statement. The record justifies the Appellate Division holding.

205 N.J. at 602-606 (footnotes and citations omitted).

Pursuant to the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, "No person ... shall be compelled in any criminal case to be a witness against himself ... ."  In Miranda v. Arizona, the Supreme Court of the United States held that:

> when an individual is taken into custody or otherwise
> deprived of his freedom by the authorities in any
> significant way and is subjected to questioning, the
> privilege against self-incrimination is jeopardized.
> Procedural safeguards must be employed to protect the
> privilege and unless other fully effective means are
> adopted to notify the person of his right of silence
> and to assure that the exercise of the right will be
> scrupulously honored, the following measures are
> required.  He must be warned prior to any questioning
> that he has the right to remain silent, that anything
> he says can be used against him in a court of law,
> that he has the right to the presence of an attorney,
> and that if he cannot afford an attorney one will be
> appointed for him prior to any questioning if he so
> desires.  Opportunity to exercise these rights must be
> afforded to him throughout the interrogation.  After
> such warnings have been given, and such opportunity
> afforded him, the individual may knowingly and
> intelligently waive these rights and agree to answer
> questions or make a statement.  But unless and until
> such warnings and waiver are demonstrated by the
> prosecution at trial, no evidence obtained as a result
> of interrogation can be used against him.

384 U.S. 436, 478-79 (1966) (footnote omitted).

To introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance of the evidence, a voluntary waiver of Miranda rights.  Colorado v. Connelly, 479 U.S. 157, 168-69

(1986).  This is a rule of constitutional dimension, violation
of which may justify issuance of a writ of habeas corpus.  See
generally Dickerson v. United States, 530 U.S. 428 (2000).

"The requirement that Miranda warnings be given does not,
of course, dispense with the voluntariness inquiry.  But ...
'[c]ases in which a defendant can make a colorable argument that
a self-incriminating statement was 'compelled' despite the fact
that the law enforcement authorities adhered to the dictates of
Miranda are rare.'"  Dickerson, 530 U.S. at 444.

> The Supreme Court has made clear that a statement
> is involuntary when the suspect's "will was overborne
> in such a way as to render his confession the product
> of coercion." Arizona v. Fulminante, 499 U.S. 279,
> 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In
> determining whether a statement is voluntary, Supreme
> Court precedent requires consideration of "the
> totality of all the surrounding circumstances--both
> the characteristics of the accused and the details of
> the interrogation." Dickerson v. United States , 530
> U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)
> (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226,
> 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These
> surrounding circumstances include "not only the
> crucial element of police coercion, Colorado v.
> Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d
> 473 (1986)," but may also include "the length of the
> interrogation, its location, its continuity, the
> defendant's maturity, education, physical condition,
> and mental health." Withrow v. Williams, 507 U.S.
> 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some
> internal citations omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).

"[S]ubsidiary questions, such as the length and
circumstances of the interrogation, the defendant's prior

experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant.  The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable."  Dickerson, 474 U.S. at 117.

Here, there is evidence in the record to support the state court findings that Petitioner went with the police voluntarily, that he was timely advised of his Miranda rights, and that he knowingly and voluntarily waived those rights.  Moreover, he was an adult at the time of questioning, and he was not interrogated for an unduly long time or under unduly harsh circumstances.  Although Petitioner had consumed alcohol prior to his questioning, which ran into the early hours of the morning, these circumstances alone are not sufficient to overcome the state court's finding that the questioning was not conducted in a manner sufficient to overcome Petitioner's will.  The decision of the Supreme Court of New Jersey was neither contrary to nor an unreasonable application of controlling Supreme Court precedent nor was it based on an unreasonable determination of the facts in light of the evidence before it.  Petitioner is not entitled to relief on this claim.

C.    <u>The Expert Testimony</u>

Petitioner next argues his rights under the Sixth and Fourteenth Amendments were violated when the prosecution was permitted to elicit testimony, from a child-abuse expert, regarding the truthfulness of child sex abuse victims.

The Supreme Court of New Jersey found these allegations "disturbing," 205 N.J. at 607, and undertook a detailed analysis of the proper scope and use of expert testimony on the Child Sex Abuse Accommodation Syndrome ("CSAAS"), before ultimately determining that there had, indeed, been error with respect to the scope of the CSAAS testimony introduced at trial.

> The use of Child Sexual Abuse Accommodation Syndrome (CSAAS) expert testimony is well settled. In 1993, this Court held that expert testimony in the area of CSAAS was permissible in order to "explain why many sexually abused children delay reporting their abuse, and why many children recant allegations of abuse and deny that anything occurred." Such testimony is categorized as behavioral-science testimony because it describes behavior commonly observed in sexually-abused children. The behavioral studies of CSAAS are designed not to provide certain evidence of guilt or innocence, but rather to insure that all agencies, including the clinician, the offender, the family, and the criminal justice system offer "the child a right to parity with adults in the struggle for credibility and advocacy."
>
> The rationale supporting the use of CSAAS testimony was first presented in a comprehensive manner by Dr. Roland Summit. Roland C. Summit, M.D., The Child Sexual Abuse Accommodation Syndrome, 7 Child Abuse & Neglect 177 (1983). Dr. Summit undertook a

scientific study of child-sexual-abuse victims to
remedy the systemic injury to the child that results
from disbelief of abuse. The "purpose of the study was
to improve the health of the child, ensure that
children receive adequate treatment for what they had
suffered, and guarantee that society's response is not
flawed by misperceptions." The CSAAS "represents a
common denominator of the most frequently observed
victim behaviors." It includes five categories of
behavior, each of which contradicts the most common
assumptions of adults: (1) secrecy; (2) helplessness;
(3) entrapment and accommodation; (4) delayed
disclosure; and (5) retraction. Accordingly, CSAAS
provides a "common language" for analysis and a more
"recognizable map" to the understanding of sexual
abuse.

When CSAAS evidence is presented to a jury, the
court must ensure that it is used in accordance with
its scientific underpinnings, "i.e. the evidence [i]s
not offered to explain the conflicting behavioral
traits in this case either of accommodation or delayed
disclosure." Accordingly, the evidence cannot be
presented to the jury to prove directly and
substantially that sexual abuse occurred. Dr. Summit
did not intend the accommodation syndrome as a
diagnostic device—it does not detect sexual abuse.
Instead, it assumes the presence of sexual abuse, and
explains a child's often counter-intuitive reactions
to it. CSAAS has a limited, therapeutic purpose, not a
predictive one, so "the evidence must be tailored to
the purpose for which it is being received."

In State v. P.H., 178 N.J. 378, 840 A.2d 808
(2004), the Court summarized the purpose of CSAAS
expert testimony:

> CSAAS expert testimony may serve a "useful
> forensic function" when used in a
> rehabilitative manner to explain why many
> sexually abused children delay in reporting
> their abuse, or later recant allegations of

abuse.... That is, it helps to dispel preconceived, but not necessarily valid, conceptions jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help.... CSAAS expert testimony should be admissible to assist a jury in evaluating evidence about an alleged victim's post-assault conduct or behaviors when that conduct may be misperceived by jurors as inconsistent with the truthfulness of the claim of assault. Such testimony properly can be used to explain why a victim's reactions, as demonstrated by the evidence, are not inconsistent with having been molested.

[178 N.J. at 395 (citation omitted).]

Simply stated, CSAAS cannot be used as probative testimony of the existence of sexual abuse in a particular case. Therefore, introduction of such testimony will be upheld so long as the expert does not attempt to "connect the dots" between the particular child's behavior and the syndrome, or opine whether the particular child was abused.

In the present matter, Dr. Coco, a psychologist at the Audrey Hepburn Children's House, testified as an expert witness about CSAAS. Dr. Coco explained to the jury that CSAAS was developed by Dr. Summit to describe behaviors of child sexual abuse victims. He noted that Dr. Summit's purpose was to educate lay people who would otherwise not understand the typical behaviors of such child victims. Dr. Coco outlined these typical characteristics as: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed or unconvincing disclosure; and (5) retraction or recantation. After discussing each characteristic, Dr. Coco noted that CSAAS is "not a diagnosis," and cannot be used as "a tool to decide whether or not sexual abuse had happened." He clarified that "all

[the CSAAS] is telling you is that these are very
common responses that children have to child sexual
abuse[.]" Dr. Coco emphasized that he knew nothing
about D.L. or this particular case, and that his
testimony did not "relate ... to this case in any
way." He stressed that the purpose of his testimony
was "to inform solely about the—the accommodation—the
child sexual abuse accommodation syndrome and that's
all."

On cross-examination, Dr. Coco reiterated that he
had not, at any point, interviewed the alleged victim
pertaining to this case nor reviewed any of her
alleged statements. He repeated that he had "no
opinion" as to whether CSAAS applied to D.L. Dr. Coco
reiterated that CSAAS is not a diagnostic tool and
cannot be used to determine "whether or not the
alleged victim in this particular case is telling the
truth." He did, however, "concede ... that there are
people, even children, who do falsely report sexual
abuse," but added that "the great majority of them do
not." Focusing on this statement, Dr. Coco was
examined about whether certain age brackets are more
likely to falsely allege sexual abuse. He responded
that it was "probably more [likely] in the younger
age," but that he could not recall Dr. Summit's
research precisely.

On re-direct examination, Dr. Coco again noted
that children infrequently lie about child sexual
abuse. When asked to "estimate for us in your clinical
experience how many children have lied in your
experience about it [,]" defendant objected, claiming
that Dr. Coco was not to discuss his clinical
experience and challenging how he knew whether kids
lied. The trial judge overruled that objection, noting
that defendant had "opened the door" ... .

Dr. Coco again was asked, in his "clinical
experience," how often he has observed children lie
about sexual abuse. He replied:

You know, yeah, the research is pretty clear
that the great majority of children do not
lie about. Of course the research is going
to differ in what the actual percentage is
of that. So you know, you might be anywhere
from five percent of children are found to
lie to 10 percent, but it's hard to get a
real number on that. But the great majority
of children do not lie about the sexual
abuse. And in many ways they actually under
report what actually happens to them, in
terms of the details of the actual abuse
incident.

On re-cross, Dr. Coco reiterated that the great
majority of children do not lie about sexual abuse.
The following colloquy ensued: [FN11]

[FN11] We detail the colloquy on this
subject because it is significant to the
question of harmless error.

Q: What about 16 year olds? You said it's
not across the board, that as you got down
the age scale that it's more likely that the
kids are telling the truth when they report
being sexually abused. Do you [have] any
statistical analysis either from Dr. Summit
or your own—your own clinical analysis as to
what the percentage of times is for a 16
year old?

A: The research is not, you know going—there's
nothing that's going to be able to give you a
clear number on that, but again, an adolescent
has more ability to do things with information
than a younger child does so that they would be
more capable of fabricating something than a
younger child would.

Q: So the statistics that you provided, five
percent, very low level, don't necessarily apply
to a 16 year old who discloses something?

28

A: I can't say it does.

...

Q: Sometimes in fact there's false allegations in that type of hypothetical and you have no type of statistical breakdown that you could give us right now as to that hypothetical, right?

A: You're asking for a specific number, I can't give you that, but I can stick to the fact that the great majority of children, throughout the age groups, do not lie about child sexual abuse.

...

Q: Do statistics bear that out then, you just talked about a dynamic in kids. Do the statistics bear that out? Do the statistics that you just talked about, do they bear out that a greater percentage of the kids in the low age of range of childhood tell the truth versus kids at the upper range of childhood? Do the statistics bear out the dynamic that you just talked about?

A: The statistics show that over the range ages, the great majority of children do not lie about sexual abuse. That there are many things that intervene with adolescents that can [affect] their, you know, their stories or their disclosures. But like I said before, the dynamics of hostility and what have you are not something that we relate to children lying about sexual abuse. Adolescents have more ability to fabricate stories, but that doesn't necessarily mean that they do it more frequently in regards to sexual abuse.

Dr. Coco's testimony included an assertion that only 5-10% of children exhibiting CSAAS symptoms lie about sexual abuse. Such testimony creates an inference that D.L. told the truth in her original accusation, despite her motives to fabricate the allegations, and notwithstanding her trial testimony

29

recanting them. Certainly, that is not the purpose of
CSAAS testimony or the reason for its admission. Even
Dr. Coco so acknowledged. Accordingly, we hold that
expert testimony about the statistical credibility of
victim-witnesses is inadmissible. Statistical
information quantifying the number or percentage of
abuse victims who lie deprives the jury of its right
and duty to decide the question of credibility of the
victim based on evidence relating to the particular
victim and the particular facts of the case. Any CSAAS
expert testimony beyond its permissible, limited scope
cannot be tolerated.

205 N.J. at 608-14.

Having found error in the introduction of CSAAS testimony

reflecting on the credibility of the victim, the Supreme Court

of New Jersey proceeded to address the question whether that

error had deprived Petitioner of a fair trial.

The impact of Dr. Coco's testimony in this case,
however, presents a different question. Convictions
after a fair trial, based on strong evidence proving
guilt beyond a reasonable doubt, should not be
reversed because of a technical or evidentiary error
that cannot have truly prejudiced the defendant and
affected the end result. That is often the true issue
in many appeals. [FN12] This appeal is no different.

[FN12] The appropriate test for determining
whether the error was unduly prejudicial or
harmless may turn on the existence of a
constitutional violation. See Chapman v.
California, 386 U.S. 18, 24, 87 S.Ct. 824,
828, 17 L.Ed.2d 705, 710 (1967), overruled on
other grounds by Brecht v. Abrahamson, 507
U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353
(1993) ("before a federal constitutional error
can be held harmless, the court must be able
to declare a belief that it was harmless

beyond a reasonable doubt"); <u>State v. Daniels</u>,
182 N.J. 80, 861 A.2d 808 (2004); <u>State v.
Macon</u>, 57 N.J. 325, 335, 273 A.2d 1 (1971)
("No matter how a test may be stated, the
question whether an error is reason for
reversal depends finally upon some degree of
possibility that it led to an unjust
verdict").

   In order for Dr. Coco's testimony to not unduly
prejudice defendant, it had to be clear to the jury
that he did not interview or evaluate D.L. and that he
was not commenting on her credibility or testimony. So
viewed, we conclude that the totality of the
circumstances neither deprived defendant of a fair
trial nor compels reversal. First, Dr. Coco repeatedly
clarified that the purpose of his testimony was to
advise the jury about characteristics child abuse
victims may exhibit. Second, it was clear that D.L.
was almost an adult and, therefore, at the age of
intellect and experience at which more alleged abuse
victims may lie. Third, it was defense counsel, on
cross-examination, who first addressed the issue of
falsification by children at different age levels.
Fourth, the State did not refer in summation to the
portion of Dr. Coco's testimony concerning the
percentage of young women who lie. And finally, the
trial judge instructed the jury not to consider Dr.
Coco's testimony "as offering proof that child sexual
abuse occurred in this case," or "whether abuse
occurred or did not occur," or to "consider that
testimony as proving in and of itself that [D.L.], the
alleged victim here, was or was not truthful." More to
the point, after a detailed and exhaustive jury charge
concerning the proper use of CSAAS testimony, the
judge concluded that charge by underscoring that the
jury "may not consider the expert testimony as in any
way proving that [W.B.] committed an act or did commit
any particular act of—of abuse. Testimony as to the
accommodation syndrome is offered only to explain

certain behavior of an alleged victim of child sexual
abuse."

Thus, the totality of the circumstances did not
deprive defendant of a fair trial, and reversal is not
warranted. This result also flows from the other
evidence in the case. At trial, D.L. recanted her
statement to Det. Gade and explained it was a
"disaster" for her family when defendant was arrested.
Defendant did not contest the ruling permitting the
admission of D.L.'s statement on his appeal before the
Appellate Division, nor did he raise it as an issue in
the petition for certification. Accordingly, that
determination is not before us for review. In this
regard, we simply note, however, that the judge
conducted a Gross [FN13] hearing at which Det. Gade
testified and the record clearly supports the trial
judge's determinations concerning admission of D.L.'s
statement and the fresh complaint testimony. Moreover,
the aggregate of D.L.'s prior statement, admitted as a
prior inconsistent statement under N.J.R.E. 803(a)(1),
after the Gross hearing, J.C.'s testimony about the
allegations in the victim's call to him, and
defendant's own statement provided the jury more than
sufficient evidence on which to sustain the
convictions.

[FN13] State v. Gross, 121 N.J. 1, 577 A.2d
806 (1990).

205 N.J. at 614-15 (citations omitted).

It is well-established that the violation of a right

created by state law is not cognizable as a basis for federal

habeas relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

("We have stated many times that 'federal habeas corpus relief

does not lie for errors of state law.'" (quoting Lewis v.

Jeffers, 497 U.S. 764, 680 (1990))), quoted in Swarthout v.

_Cooke_, 131 S.Ct. 859, 861 (2011); _Ross v. District Attorney of_
_the County of Allegheny_, 672 F.3d 198, 207 n.5 (3d Cir. 2012)
(citing _Estelle_).  Accordingly, Petitioner cannot obtain relief
for the alleged errors in state law evidentiary rulings, unless
they rise to the level of a deprivation of due process.  _See_
_Estelle_, 502 U.S. at 70 ("'the Due Process Clause guarantees
fundamental elements of fairness in a criminal trial'") (quoting
_Spencer v. Texas_, 385 U.S. 554, 563-64 (1967)).  Nevertheless,
the Supreme Court has noted that "the Due Process Clause does
not permit the federal courts to engage in a finely tuned review
of the wisdom of state evidentiary rules," _Marshall v._
_Lonberger_, 459 U.S. 422, 438 n.6 (1983).

     For a habeas petitioner to prevail on a claim that an
evidentiary error amounted to a deprivation of due process, he
must show that the error was so pervasive as to have denied him
a fundamentally fair trial.  _Keller v. Larkins_, 251 F.3d 408,
413 (3d Cir.), _cert. denied_, 534 U.S. 973 (2001), _cited in_ _Lee_
_v. Glunt_, 667 F.3d 397, 403 (3d Cir. 2012).  _Cf._ _Montana v._
_Egelhoff_, 518 U.S. 37, 43 (1996) (holding that "the power of the
State to regulate procedures under which its laws are carried
out ... is not subject to proscription under the Due Process
Clause unless it offends some principle of justice so rooted in
the traditions and conscience of our people as to be ranked as
fundamental" (citations and internal quotation marks omitted)).

The Supreme Court "has defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. .S., 493, U.S. 342, 352 (1990).

Here, the Supreme Court of New Jersey determined that the trial court had erred with respect to the admission of certain CSAAS testimony.  Nevertheless, it determined that the error was harmless.  The Supreme Court of New Jersey correctly identified and applied the governing principles set forth in the controlling U.S. Supreme Court precedents.  Petitioner is not entitled to relief on this claim.

D.    The Jury Instructions

Petitioner contends that the jury charge on Child Sexual Abuse Accommodation Syndrome violated his rights under the Sixth and Fourteenth Amendments, because it deprived him of the right to have the jury engage in an unfettered determination of the credibility of the victim.  More specifically, Petitioner objects to the court's instruction to the jury that, "You may not automatically conclude that her [D.L.'s] testimony is untruthful based only on her delayed disclosure."  (Answer, Ex. 32, Petitioner's Brief on Petition for Certification, at 4.) The Supreme Court of New Jersey rejected this claim.

> Defendant further claims that his convictions
> must, in any event, be reversed because the jury
> charge amounted to an instruction to convict and
> usurped the jury's responsibility to assess
> credibility. In gauging this claim, we are mindful

34

that the trial judge used the model charge as amended
by this Court in [State v. P.H., 178 N.J. 378, 399-400
(2004)].

P.H. considered, in detail, the admissibility of
both fresh complaint and CSAAS testimony, as well as
the relevant jury charges. Both doctrines deal with
problems stemming from an abuse victim's failure to
report an event, delayed reporting, and popular
misconceptions for so doing. In P.H., the victim was
the defendant's daughter and the sexual abuse occurred
during seven visits with her father from 1984 through
1990. Although she disclosed certain instances of
inappropriate sexual behavior, she did not report the
sexual assaults until 1996.

[In P.H., the] trial court instructed the jury on
both the Model Jury Charge on Fresh Complaint
(concerning a victim's failure to report or delayed
reporting) and CSAAS (concerning use of the expert
testimony on that subject) after presentation of CSAAS
expert testimony by both the State and defense. On
appeal, the Appellate Division reversed and remanded
for a new trial, determining "that defendant's due
process and confrontation rights were violated by
instructions that precluded the jury from considering
the belated nature of [the victim]'s disclosure in the
context of assessing her overall credibility."

After granting certification [in P.H.], we
concluded that instructing on both fresh complaint and
CSAAS "clearly had the capacity to confuse the jury"
as to its role in assessing the victim's credibility.
We explained that, to the extent our jurisprudence on
"fresh complaint" instructions and, particularly,
[State v. Bethune, 121 N.J. 137, 144-49 (1990)],

> may be read to render victim silence or
> delay in reporting irrelevant to a jury's
> overall assessment of credibility, the case
> before us provides a vehicle for
> clarification. In performing its exceedingly
> important task of assessing credibility, the

35

jury should be permitted to consider all
relevant testimony. Viewed in the context of
all the facts surrounding the claimed abuse,
the timing of the report of abuse, or
silence about it, can be relevant for the
jury to consider in the totality of the
circumstances. So long as the jury is
instructed that such silence or delay, in
and of itself, is not inconsistent with a
claim of abuse, the proper balance is
struck.

[P.H., supra, 178 N.J. at 397, 840 A.2d 808.]

We emphasized, however, that CSAAS testimony may
explain "why a child victim may remain silent" and
"not have made a fresh complaint." It may also explain
the behaviors and conduct of a child victim, "such as
the child's affection towards the abuser [and]
recantation of the complaint .... that can cast doubt
or otherwise affect the evaluation of the child's
testimony," and is admissible for that purpose. ... As
a result, we instructed the trial court, on remand, to
use the Model Jury Charge (Criminal) for Child Sexual
Abuse Accommodation Syndrome (2001), if the trial
judge found proof of delayed disclosure and CSAAS
testimony was admitted in response, rather than using
both the Fresh Complaint and CSAAS Model Jury Charges.

To maintain the necessary and proper balance, we
also directed inclusion of the following language at
the beginning of the charge:

The law recognizes the stereotypes about
sexual assault complainants may lead some of
you to question [complaining witness's]
credibility based solely on the fact that
[he or she] did not complain of the alleged
abuse sooner. You may not automatically
conclude that [complaining witness's]
testimony is untruthful based only on [his
or her] silence/delayed disclosure. Rather,
you may consider the silence/delayed

disclosure along with all of the other
evidence including [complaining witness's]
explanation for his/her silence/delayed
disclosure when you decide how much weight
to afford to [complaining witness's]
testimony. You also may consider the expert
testimony that explained that silence, is in
fact, one of the many ways in which a child
may respond to sexual abuse. Accordingly,
your deliberations in this regard should be
informed by the testimony you heard
concerning child abuse accommodation
syndrome.

[Id. at 400, 840 A.2d 808 (emphasis added).]

We explained our reason for so directing:

By including that statement, or one of
similar wording, as a preface to the model
CSAAS charge, the instruction will address
the concerns expressed in Bethune as well as
our findings in J.Q. In situations in which
a defendant presents relevant evidence of a
child victim's delay in reporting alleged
abuse, and the State does not present
evidence of CSAAS, the appropriate
instruction if requested by the State, would
be one similar to the statement outlined
above absent the last two sentences. We
refer this matter to the Model Charge
Committee for their consideration and
suggestions for refinement.

[Ibid.]

With that amendment, the suggestion that jurors could
not consider for any purpose the "child victim's delay
in reporting alleged abuse" was eliminated.

We adhere to P.H. and find no basis on which to
reverse the conviction because the model CSAAS charge,

as amended, was given and the "fresh complaint" charge
was not. ...

205 N.J. at 619-22 (citations omitted).

Generally, questions relating to jury instructions are
matters of state law not cognizable in federal habeas review.
See Engle v. Isaac, 456 U.S. 107 (1982); Henderson v. Kibbe, 431
U.S. 145 (1977).  Thus, even a jury instruction that is
inconsistent with state law does not necessarily merit federal
habeas relief.

Where a federal habeas petitioner seeks relief based upon
the jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial
> that the resulting conviction violates due process."
> It is well established that the instruction "may not
> be judged in artificial isolation," but must be
> considered in the context of the instructions as a
> whole and the trial record.  In addition, in reviewing
> an ambiguous instruction ..., we inquire "whether
> there is a reasonable likelihood that the jury has
> applied the challenged instruction in a way" that
> violates the Constitution.  And we also bear in mind
> our previous admonition that we "have defined the
> category of infractions that violate 'fundamental
> fairness' very narrowly."  "Beyond the specific
> guarantees enumerated in the Bill of Rights, the Due
> Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations
omitted).

The Due Process Clause is violated only where "the
erroneous instructions have operated to lift the burden of proof
on an essential element of an offense as defined by state law."

38

Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).  Similarly, where a jury instruction operates to "remove from the jury's consideration a necessary element of the prosecutor's case," the Sixth Amendment right to trial by jury is implicated.  See, e.g., Gonzalez v. Wolfe, 290 F.App'x 799, 811-12 (6th Cir. 2008), cert. denied, 555 U.S. 1144 (2009) (citing Cheek v. U.S., 498 U.S. 192, 203 (1991)).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).  "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless."  Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

a single instruction to a jury may not be judged in

39

artificial isolation, but must be viewed in the
context of the overall charge.  If the charge as a
whole is ambiguous, the question is whether there is a
reasonable likelihood that the jury has applied the
challenged instruction in a way that violates the
Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal

quotation marks and citations omitted).

Thus, even if there is "'ambiguity, inconsistency, or

deficiency' in the instruction, such an error does not

necessarily constitute a due process violation.  Rather, the

defendant must show both that the instruction was ambiguous and

that there was "'a reasonable likelihood'" that the jury applied

the instruction in a way that relieved the State of its burden

of proving every element of the crime beyond a reasonable

doubt."  Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009)

(internal citations omitted).

Here, this Court agrees with the Supreme Court of New

Jersey that the challenged instruction, taken in context, merely

provided a framework for considering all of the relevant

evidence in determining the credibility of the victim, and did

not compel any particular result.  To the extent there was

error, it was harmless error.  This Court is confident that the

challenged instruction did not have a "substantial and injurious

effect or influence" on the verdict.  Petitioner is not entitled

to relief on this claim.

40

E.   <u>The Prosecutor's Summation</u>

Petitioner alleges that the prosecutor's summation exceeded fair advocacy and deprived him of a fair trial.  Although Petitioner does not describe in his Petition the challenged remarks, the Court notes that on direct appeal Petitioner objected to that portion of the summation in which the prosecutor appealed to the jury to send a message to the victim that they believed her initial reports of abuse and that they understood why she had recanted.  (Answer, Ex. 23, Petitioner's Brief to the Appellate Division, at 53-56; Ex. 32, Petitioner's Brief to Supreme Court of New Jersey, at 8-9.)

The Appellate Division noted this claim, but found it so lacking in merit that it did not warrant discussion in the court's opinion.  <u>State v. W.B.</u>, 2009 WL 5062352, *10 (N.J. Super. App. Div. Dec. 28, 2009).  Similarly, the Supreme Court of New Jersey found the issue unworthy of discussion.  <u>State v. W.B.</u>, 205 N.J. at 623, n.18.

The U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.  ... Consequently, improper suggestions,

> insinuations, and, especially, assertions of personal
> knowledge are apt to carry much weight against the
> accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935), cited in Cone
v. Bell, 556 U.S. 449, 469 (2009).  Under the Berger standard,
it is well established that it is improper for a prosecutor to
appeal to the passions and prejudices of a jury or to suggest
that the jury should decide the case on any basis other than the
relevant evidence and law.  See, e.g., Moore v. Morton, 255 F.3d
95, 116- 17 (3d Cir. 2001) (collecting cases).

Nevertheless, under U.S. Supreme Court precedent, where a
prosecutor's opening or closing remarks are challenged in
habeas, "[t]he relevant question is whether the prosecutor's
comments 'so infected the trial with unfairness as to make the
resulting conviction a denial of due process.'"  Darden v.
Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v.
DeChristoforo, 416 U.S. 637 (1974)).  See also Parker v.
Matthews, 132 S.Ct. 2148, 2153 (2012) (noting that the "clearly
established Federal law" relevant to a habeas challenge to a
prosecutor's closing remarks is the holding set forth in Darden,
in reliance on Donnelly).  Thus, "Supreme Court precedent
counsels that the reviewing court must examine the prosecutor's
offensive actions in context and in light of the entire trial,
assessing the severity of the conduct, the effect of the
curative instructions, and the quantum of evidence against the

42

defendant." <u>Moore v. Morton</u>, 255 F.3d 95, 107 (3d Cir. 2001).

Here, in the context of a trial where the child victim had recanted her initial accusation against the defendant and the jurors had heard expert testimony regarding this type of behavior, the prosecutor's remarks can be as easily construed as an argument regarding the difficult credibility issues facing the jurors as an appeal to the passions of the jurors. Certainly, in light of the evidence presented and the trial court's careful instructions to the jury, the prosecutor's remarks did not so infect the trial with unfairness as to amount to a denial of due process. Petitioner is not entitled to relief on this claim.

F.    <u>The Jury Deliberations</u>

Petitioner asserts that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court permitted the jury to view a videotape of Petitioner's confession, which had not been admitted into evidence, during its deliberations.

As background for evaluation of this claim, the Court notes that this entire trial was videotaped and there was no court reporter to read back any testimony, should the jury have requested it. During deliberations, the jury requested a playback of both the videotaped confession, from the night of Petitioner's questioning by police, which had been played for the jury during trial but had not been admitted into evidence,

and the testimony of the investigating officer, Det. Gade, as she read the written statement given by the victim, which also had not been admitted into evidence.  Counsel for Petitioner objected to the playback of all of this evidence, arguing that the statements, including the confession, should be read to the jury, but that to view the actual taped testimony and confession placed undue emphasis on these matters, as opposed to all the other evidence presented at trial.[4]  Following argument by both counsel, the trial court called the jury into the courtroom and played back both the videotaped confession and the officer's reading of the victim's written statement.  The jury did not have any of this videotape in the jury room.  (Answer, Ex. 20, Transcript of Feb. 7, 2008, Trial at 72-96.)

On direct appeal, the Supreme Court of New Jersey rejected Petitioner's challenge to the fairness of this playback procedure.

> Defendant next argues that his videotaped confession was played back to the jury during its deliberations, and because the tape itself was not admitted into evidence, the trial judge did not follow the procedures for such playback as detailed in State v. Burr, 195 N.J. 119, 948 A.2d 627 (2008).

---

[4] In his closing argument, counsel for Petitioner had advised the jury that they could get a "readback" of the victim's statement to police and of Petitioner's confession, emphasizing that the similarities between the two statements suggested that the investigating officer had told Petitioner during his questioning what the victim had said earlier.  (Answer, Ex. 19, Transcript of Feb. 6, 2008, Trial at 141-42, 145, 171-72.)

In Burr, the victim's pretrial, videotaped statement was admitted into evidence, and played back, "over defendant's objection," in open court at the jury's request. Burr approved the playback, but codified a four-step procedure for the proper use of such playbacks. First, the jury should be asked if a readback of the statement would suffice. "If the jury persists in its request to view the videotape again, then the court must take into consideration fairness to the defendant." Second, "[t]he court must determine whether the jury must also hear a readback of any direct and cross-examination testimony that the court concludes is necessary to provide the proper context for the video playback." Third, the trial judge must permit the defendant to demonstrate that "consequential prejudice ... from the playback could not be ameliorated through other means." Fourth, playback "must occur in open court." See also State v. Miller, 205 N.J. 109, 13 A.3d 873 (2011) (adopting precautionary measures and guidelines for playbacks of video and digital recordings of trial testimony).

In the context of this appeal, the playback of the videotape did not constitute an abuse of discretion. Here, the playback of the videotape was in open court, and the tape—whether admitted into evidence [FN16]—was played to the jury as part of the State's case. Moreover, the trial itself was videotaped, and there was no court reporter or transcriber available to read back what was played to the jury. And, defendant's reliance on that statement—as evidenced by his statement in summation that the videotape was "in evidence" and his encouragement of the jury to request a "readback" and listen carefully—looms large in the resolution of this question. Against that factual backdrop, there is no basis to reverse defendant's convictions, even if the videotape was not admitted into evidence, merely because the jury saw the playback of a videotaped statement that already had been played to it as part of the State's case.

> FN16. It appears that the tape was never
> moved into evidence.

205 NJ at 622-23 (citations and footnotes omitted).

Petitioner has cited no Supreme Court precedent, and this
Court has located none, delineating the manner in which a trial
court should respond to a jury's request to have certain
testimony read or played back for them.  Cf. Ewell v. Scribner,
490 F.App'x 891, 893 (9th 2012) ("There is no clearly
established Supreme Court authority that a jury's playback of a
tape that was admitted into evidence violates a defendant's
constitutional rights."), cert. denied, 133 S.Ct. 973 (2013).
Accordingly, to prevail on a due process claim premised on a
trial court's response to a jury question, the habeas petitioner
must establish that the court's response violated the
"'fundamental fairness' essential to justice." See Marra v.
Larkins, 46 F.App'x 83, 87 (3d Cir. 2002) (citing Donnelly v.
DeChristoforo, 416 U.S. 637, 642 (1974)), cert. denied, 537 U.S.
1112 (2003).

The Court of Appeals for the Third Circuit has held that a
trial court has broad discretion to respond to a jury's requests
for either a readback of testimony or provision of written
transcripts, limited by two considerations:  "(1) such requests
may slow the trial where the requested testimony is lengthy; (2)
when read only a portion of testimony, the jury may give undue

weight to that portion." See, e.g., U.S. v. Bertoli, 40 F.3d 1384, 1399-1401 (3d Cir. 1994). Additionally, in exercising its discretion, a trial court should be cognizant of "dangers that may be present in the particular case," and should tailor its response appropriately. Bertoli, 40 F.3d at 1400-01.

Here, the trial court made its decision regarding the jury's request only after giving counsel an opportunity to present their concerns. The jury viewed videotapes of the complete statements provided to police by Petitioner and the victim, in the same form in which they were presented at trial. The playbacks occurred in open court. For Petitioner to contend, now, that he was deprived of a fair trial by this procedure, after having invited the jury to request a readback of the very same testimony, is simply disingenuous. This Court agrees with the Supreme Court of New Jersey that Petitioner has suffered no unfairness, and he is not entitled to relief on this claim. Cf. U.S. v. Houser, 413 F.App'x 476, 479-80 (3d Cir. 2011) (finding no abuse of discretion in permitting jury to consider paper transcripts, not moved into evidence, of videotape that was moved into evidence, where cautionary instruction was given); Vreeland v. Warren, Civil No. 11-5239, 2013 WL 1867043, *15-16 (D.N.J. May 2, 2013) (finding no unfairness in permitting jury to have tape and tape player during deliberations so they could listen to the defendant's

47

recorded statement); <u>Rutherford v. Hendricks</u>, Civil No. 02-3131, 2005 WL 1541063 (D.N.J. June 30, 2005) (finding no abuse of discretion, in case where no transcripts existed and court reporter was on vacation, when trial judge responded to jury requests by conferring with counsel to reach agreement as to the substance of the testimony concerned, along with a cautionary instruction that the jury's own recollection of the testimony controlled).

## IV.   <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003) (citation omitted), <u>cited in</u> <u>Eley v. Erickson</u>, 712 F.3d 837, 845 (3d Cir. 2013).

Here, jurists of reason would not disagree with this Court's resolution of Petitioner's claims.  No certificate of

appealability shall issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition shall be denied.  This Court will deny the request for an evidentiary hearing and will not issue a certificate of appealability.  An appropriate order follows.


<u>/s/ Dickinson R. Debevoise</u>
Dickinson R. Debevoise
United States District Judge

Dated:  April 24, 2014